**APCOA, INC. and Federal Insurance Company, Plaintiffs–Appellees,**

**v.**

**FIDELITY NATIONAL BANK, Defendant–Appellant, Third–Party Plaintiff,**

**v.**

**Dolly ISON, a/k/a Dolly Medlin, a/k/a Dolly Medley, Third–Party Defendant.**

No. 89–8313.

United States Court of Appeals, Eleventh Circuit.

July 19, 1990.

R. Phillip Shinall and Terrence McQuade, Glass McCullough Sherrill & Harrold, Atlanta, Ga., for defendant-appellant, third-party plaintiff.

C. David Hailey, John P. MacNaughton, Swift Currie McGhee & Hiers, and James A. Orr, Paul Hastings Janofsky & Walker, Atlanta, Ga., for plaintiffs-appellees.

Before CLARK, Circuit Judge, HILL *, Senior Circuit Judge, and ATKINS **, Senior District Judge.

ATKINS, Senior District Judge:

This action arose from a bank embezzlement scheme whereby an employee or employees of Apcoa, Inc. embezzled several hundred thousand dollars through bank accounts opened at Fidelity National Bank in Atlanta, Georgia. Appellant Fidelity National Bank[1] appeals an order and judgment by the district court granting summary judgment for appellees/plaintiffs Apcoa, Inc. and Federal Insurance Company.[2] 703 F.Supp. 1553. On appeal Fidelity claims that there exists genuine issues of material fact precluding summary judgment concerning defenses it raised to Apcoa's claims. The district court held that Fidelity breached its contractual agreement with Apcoa and further, that Fidelity was precluded from asserting any defenses to its conduct in connection with the opening of the two unauthorized accounts because the evidence did not support such defenses as a matter of law. We affirm.

## I.

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper when it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a Judgment as a matter of law." The moving party bears the burden of meeting this exacting standard. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In assessing whether the moving party has satisfied this burden the court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. *Clemons v. Dough-*

*erty County, Ga.*, 684 F.2d 1365, 1368 (11th Cir.1982) (citing *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608).

Once the motion for summary judgment is properly made, the burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* Ultimately, the Court must decide whether the record, taken as a whole, could lead a rational trier of fact to find a genuine issue for trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II.

### FACTS

Apcoa is in the business of managing parking facilities throughout the United States. Apcoa's home office is located in Cleveland, Ohio. At all times relevant to this litigation, Apcoa maintained a field office in Atlanta, Georgia. The Atlanta field office managed those parking facilities held in Atlanta. To facilitate the transfer of funds from Apcoa's Atlanta office to Apcoa's main office in Cleveland, Apcoa maintained depository banking accounts with Atlanta banks. The parking lot revenues collected in Atlanta were to be deposited into these authorized depository accounts. Corporate Officers in Cleveland would then withdraw the funds to Cleveland where the main corporate accounts for Apcoa were located. The Atlanta office did not maintain any corporate accounts to pay expenses. Apcoa's central accounts in Cleveland were used to pay expenses such as payroll, rent and equipment.

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Appellant Fidelity National Bank will be referred to as Fidelity in this opinion.

2. Appellees Apcoa, Inc. and Fidelity Insurance Company will be referred to as Apcoa in this opinion.

There were basically four Apcoa employees significantly involved in management and operation of the Atlanta field office. Walter Stuelpe, the then Vice–President and regional manager located in Atlanta. Stuelpe, a corporate person from Cleveland stationed in Atlanta, was not involved in the day-to-day operations of the parking facilities. Victor Toledo, the district manager in charge of Atlanta operations and general office matters, reported to Stuelpe. Among the employees Toledo supervised in the Atlanta office were Dolly Ison and William Jones. Dolly Ison, the central figure in the embezzlement scheme, was initially hired as a receptionist, promoted to Toledo's secretary and later assumed the role of bookkeeper and office manager for Apcoa's Atlanta operations. Jones was the City Manager responsible for the supervision of the parking lot operations in Atlanta.

In the summer of 1982, Walter Stuelpe, Apcoa's Vice–President and regional manager based in Atlanta at the time, was dissatisfied with Apcoa's banking relationship with the C & S Bank of Atlanta and changed Apcoa's Atlanta banking accounts to Fidelity National Bank.[3] On or about June 23, 1982, William Jones opened the first account at Fidelity under the name of "APCOA, Inc. Petty Cash Account."[4] Fidelity gave Jones a form for unincorporated associations for the authority to open the account. The petty cash account was used to pay incidental office expenses.

On or about August 2, 1982, two depository accounts were opened at Fidelity pursuant to corporate authorization from the Cleveland Office. These depository accounts were to be used for the parking lot revenues that Apcoa received from the Atlanta business. Apcoa's Cleveland Office mailed to Fidelity corporate resolution papers which included Designation and Authorization Forms setting the terms and conditions associated with Apcoa's depository accounts. These Designation and Authorization Forms provided that Fidelity was authorized to pay checks on drafts "made or drawn against any funds at any time standing to the credit of Apcoa in any account carried under the name of Apcoa" when the checks and drafts were signed by two of the four designated individuals. The authorized signatures for the depository accounts listed on these forms were corporate officers from the Cleveland Office and did not include any of the employees located at the Atlanta office. All statements and other documentation on these Apcoa depository accounts were to be mailed directly to Apcoa's home office in Cleveland. Both the Designation and Authorization Forms and the Certificate provided that the documents were to continue in full force and effect until the express notice of the revocation or modification of the same was received by Fidelity. The Designation and Authorization Forms, the Certificates and the signature cards were all filed and maintained at Fidelity's branch office in Peachtree Center. A refund account was also opened at Fidelity on or about August 10, 1982 which was called "Apcoa, Inc. Refund Account." Ison opened the account at Toledo's direction to handle refund for key cards or overpayments.[5]

The first account used for the embezzlement was opened on or about September 18, 1982 and entitled "Apcoa—Special Account." Doris Moore, an employee for Fidelity opened the account for Ison. Apparently there were no corporate resolutions, authorizations, or certificates executed by any officers or authorized officials of Apcoa in connection with the opening of the Special Account. The signature card for this account listed Ison and Toledo as the authorized signatures. Apcoa's local mailing address in Atlanta was used for this account. There is no evidence that the Cleveland Office ever became aware of this

**3.** Fidelity's branch office in Peachtree Center was the branch office used by Apcoa.

**4.** It is unclear from the record below whether the Cleveland Office was aware of this petty cash account. However, the record is clear that

this account was not part of the embezzlement scheme.

**5.** This account was not used for illegitimate purposes.

account until the scheme was discovered. In March of 1983, the mailing address of this account was changed to a post office box that was not maintained in the name of Apcoa. On or about May 16, 1983, Ison closed this special account and opened a second unauthorized account at Fidelity. The second account was entitled "Dolly Ison for Apcoa" and was also used for the embezzlement scheme. All bank statements and other documents of the Ison for Apcoa account were mailed to the post office box which was not maintained by Apcoa. Again, there were no separate authorization papers filed in connection with this account.

Mr. Sharon Denney, the Branch Manager of Fidelity's Peachtree Center branch testified that authorizations were not obtained because the bank already had authorizations on file for Apcoa. There is no dispute that those documents do not authorize Dolly Ison or Victor Toledo to withdraw funds deposited into any Apcoa account. Doris Moore, the Fidelity employee who opened both the Special Account and the Ison for Apcoa account was aware of the existing depository accounts and that certain documentation had been executed in connection with these accounts. Doris Moore also knew that the Ison for Apcoa account had nothing to do with the parking lot managed by Apcoa and further understood that none of the checks which represented Apcoa's parking lot revenues were to be deposited in this account.

From September 1982 through January of 1985, Ison converted approximately $259,611.85 in parking lot receipts from Apcoa by depositing checks payable to Apcoa in these two unauthorized accounts and then withdrawing money by writing checks on the account. The checks deposited in the Special Account and the Ison for Apcoa account were taken from the monthly parking payments which were either brought or mailed to Apcoa's Atlanta Office by its customers. These checks were intercepted and endorsed by either a stamp which read "For Deposit Only" or a combination of the words "For Deposit Only" and "Apcoa" written on the back of the check. The checks were directly deposited into the un-authorized accounts. All the checks written on the unauthorized accounts bore the single signature of Dolly Ison.

## III.

### DISCUSSION

The issues on appeal relate to the defenses available to Fidelity in defending this action and whether the district court should have decided these issues as a matter of law.

### A. Standards of the Various Defenses

#### 1. *Defense of Commercial Reasonableness*

The Uniform Commercial Code provides an affirmative defense to a conversion claim if the Bank acted "in good faith and in accordance with reasonable commercial standards." O.C.G.A. § 11–3–419(3) (1982). Good faith and reasonableness are separate requirements of O.C.G.A. § 11–3–419(3) and both must be met to support the bank's defense. *National Bank of Georgia v. Refrigerated Transport Co.*, 147 Ga.App. 240, 248 S.E.2d 496, 499 (1978); *Trust Company Bank of Augusta N.A. v. Henderson*, 185 Ga.App. 367, 364 S.E.2d 289 (1987).

Under Georgia law, reasonable commercial standards and determining whether those standards have been met under the circumstances are, in the first instance, questions of fact. *Trust Company of Georgia Bank*, 266 S.E.2d at 258. This defense may be decided as a matter of law where the endorsements are "so irregular on their face" as to raise questions as to their validity. *Id.* (citing *Thornton & Co. v. Gwinnett Bank & Co.*, 151 Ga.App. 641, 260 S.E.2d 765 (1979)). The rule adopted in Georgia is whether a reasonable man in accordance with reasonable commercial standards would be put **on notice of some impropriety appearing either from the form of the instrument and its endorsements or from knowledge of the facts outside the instrument itself.** *Trust Company Bank*, 266 S.E.2d at 258 (emphasis supplied).

### 2. Defense of Apcoa's Own Negligence

Another defense available to a claim for conversion is set forth in O.C.G.A. § 11-3-406 which provides as follows:

Any person who by his negligence substantially contributes ... to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument **in good faith and in accordance with reasonable commercial standards** of the drawee's or payor's business.

O.C.G.A. § 11-3-406 (emphasis supplied). An important precondition to asserting this defense is a finding that the bank acted in accordance with reasonable commercial standards. *Trust Company of Georgia Bank of Savannah, N.A. v. Port Terminal and Warehouse Company*, 153 Ga.App. 735, 266 S.E.2d 254 (1980); *National Bank of Georgia*, 147 Ga.App. 240, 248 S.E.2d 496 (1978).

### 3. Defense of Apparent Authority

Under Georgia law to establish a defense of another's apparent authority, a party must demonstrate that he or she relied in good faith on the principal's and the agent's conduct which would lead a reasonable person to believe that the principal-agent relationship existed. *Stewart v. Midani*, 525 F.Supp. 843 (N.D.Ga.1981). The evidence must show that the third person in dealing with the agent relied upon the authority granted by the principal's conduct. *Interstate Financial Corp. v. Appel*, 134 Ga.App. 407, 411, 215 S.E.2d 19 (1975).

### B. Analysis

 Fidelity first asserts that the district court erred in finding their conduct commercially unreasonable as a matter of law. Applying the general principles associated with the defense of commercial reasonableness, this Court must disagree. After careful consideration of the undisputed facts and circumstances that occurred in connection with the two accounts used for

the embezzlement, we hold that Fidelity cannot avail itself of this defense as a matter of law. The district court correctly noted that Fidelity was responsible for three acts which provided the system for the embezzlement scheme: (1) the opening of the unauthorized accounts, (2) the deposit of checks payable to Apcoa into these accounts, (3) the acceptance of checks written on these accounts on the single signature of Dolly Ison.[6] Additionally the district court noted that if Fidelity had prevented any of the above acts, the embezzlement scheme would have been stopped.

Fidelity's conduct was not in accordance with reasonable commercial standards where a reasonable person would have been on notice of some impropriety appearing from the form of the instrument and its endorsements or from knowledge of the facts outside the instrument itself. *Trust Company Bank*, 266 S.E.2d at 258. The endorsements were arguably irregular on their face since some were only stamped "For Deposit Only" or stamped with some combination of "For Deposit Only" and "Apcoa" hand written on the check. However, even if the endorsements were not so "irregular on their face" there was clearly notice of some impropriety when one considers Fidelity's existing banking relationship with Apcoa.

It is undisputed that the corporate resolution (the Designation and Authorization Forms) on file with the bank created a contractual agreement or a depository contract between the parties as to how the bank was to handle funds deposited to the credit of Apcoa. *Washington Loan and Banking Co. v. Mitchell*, 162 Ga.App. 749, 292 S.E.2d 424 (1982) (a relationship between a bank and its depositor is contractual in nature). This depository contract clearly did not authorize the bank to pay checks drawn against any funds deposited to the credit of Apcoa unless the check contained two of the four designated signatures. Dolly Ison's signature was not listed as an authorized signature on these Designation and Authorization Forms. The bank completely disregarded the terms

---

**6.** There is no dispute that these events did occur.

of the written corporate resolution submitted by Apcoa and failure to do so is per se improper making summary judgment appropriate. *German Educational Television Network, LTD. v. Bankers Trust Company,* 109 App.Div.2d 684, 487 N.Y. S.2d 26, 40 U.C.Rep. 997 (1985).

The defense of Apcoa's own negligence is not available in this case since we find that Fidelity acted in a commercially unreasonable manner. *Trust Company of Georgia Bank of Savannah, N.A. v. Port Terminal and Warehouse Company,* 153 Ga. App. 735, 266 S.E.2d 254 (1980) (a precondition to asserting this defense is a finding that the bank acted in accordance with reasonable commercial standards).

The last defense issue that needs to be addressed is the argument that Fidelity was acting pursuant to Ison's apparent authority.[7] There is simply no evidence that Fidelity in dealing with Ison relied upon the authority granted by Apcoa's conduct. *Interstate Financial Corp. v. Appel,* 134 Ga. App. 407, 411, 215 S.E.2d 19 (1975). The case law and arguments presented by Fidelity on this issue are not persuasive or supportive of their position. The undisputed relevant facts do not support a defense of apparent authority and summary judgment on this defense was proper.

### IV.

### CONCLUSION

The issues before the district court were properly decided on summary judgment grounds. The district court carefully analyzed Fidelity's conduct finding that the bank violated its contractual agreement with Apcoa, violated its own internal policies and procedures in opening the unauthorized accounts, failed to inquire as to Dolly Ison's authority, admitted that it was relying on corporate resolutions which did not authorize Dolly Ison's conduct, and admitted that the accounts in question were not to receive deposits of Apcoa's funds. For the reasons stated above, we AFFIRM the district court's granting of summary judgment in favor of Apcoa as the bank

failed to present a "genuine" issue of material fact for trial.

---

7. The record is clear that Dolly Ison was not acting under any actual authority of Apcoa.